UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

Thurgood Marshall U.S. Courthouse   40 Foley Square, New York, NY 10007 Telephone: 212-857-8500

**MOTION INFORMATION STATEMENT**

Docket Number(s): 23-464 _____    _____ Caption [use short title] _____

Motion for: retroactive authorization to file a motion to further

supplement my 2/7/24 motion to recall and reinstate this appeal

Set forth below precise, complete statement of relief sought:

I seek an order that will retroactively grant me authorization to

file a motion to further supplement my 2/7/24 motion                    Komatsu v. City of New York

_____

_____

_____

_____

MOVING PARTY: Towaki Komatsu                         OPPOSING PARTY: See attached

☑ Plaintiff              ☐ Defendant

☐ Appellant/Petitioner   ☐ Appellee/Respondent

MOVING ATTORNEY: Towaki Komatsu                      OPPOSING ATTORNEY: Jamison Davies

[name of attorney, with firm, address, phone number and e-mail]

Towaki Komatsu                                       Jamison Davies

55 West 110th St., New York, NY 10026                New York City Law Department, 100 Church St., NY, NY

Tel: 305-784-7450/ E-mail: Towaki_Komatsu@yahoo.com  10007/ Tel:  212-356-2490/ e-mail: jdavies@law.nyc.gov

Court- Judge/ Agency appealed from: U.S. District Judge Valerie Caproni

Please check appropriate boxes:                      FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUCTIONS PENDING APPEAL:

Has movant notified opposing counsel (required by Local Rule 27.1):      Has this request for relief been made below?        ☐ Yes ☑ No
☑ Yes   ☐ No (explain): _____      Has this relief been previously sought in this court?  ☑ Yes ☐ No
_____             Requested return date and explanation of emergency:

Return date: As soon as possible. This

Court's 2/21/24 decision in Thomas v. United States, No. 22-2026 (2d Cir. Feb. 21, 2024) confirms that this Court subjected me to obstruction of justice

Opposing counsel's position on motion:              by violating my "sacrosanct" right to submit an appellant's brief for this appeal. While doing so, this Court biasedly didn't engage in proper fact-finding
☐ Unopposed ☐ Opposed ☑ Don't Know                  about judicial misconduct by the district court that warranted a diligent investigation. Also, Di Lapi v. City of New York, No. 06-CV-3101

Does opposing counsel intend to file a response:    (E.D.N.Y. Jan. 9, 2012) confirms that I was entitled to an investigation about the district court's mental processes about that.
☐ Yes   ☐ No   ☑ Don't Know

Is oral argument on motion requested?   ☑ Yes ☐ No (requests for oral argument will not necessarily be granted)

Has argument date of appeal been set?   ☐ Yes ☑ No  If yes, enter date: _____

Signature of Moving Attorney:

Towaki Komatsu _____ Date: 2/25/24 _____ Service by: ☐ CM/ECF  ☑ Other [Attach proof of service]

**A.**   **Second Circuit Docket number:** 23-464

**B.**   **Opposing Parties**:

| | | | |
|---|---|---|---|
| 1. | The City of New York | 8. | NYPD Officer Avdo Javorovac |
| 2. | NYPD Sergeant Frank Amill | 9. | NYPD Officer Brian Leo |
| 3. | NYPD Officer John Avellino | 10. | NYPD Officer Liang Lin |
| 4. | NYPD Officer Andrew Cummings | 11. | NYPD Officer Steven Perez |
| 5. | NYPD Officer Ruben Farrell | 12. | NYPD Officer Claudia Rodriguez |
| 6. | NYPD Officer Saquoi Harris | 13. | NYPD Captain Joseph Tompkins |
| 7. | NYPD Officer Robert Holmes | | |

**C.**   **Opposing Attorney's Contact Information**:

- **Name**: New York City Corporation Counsel Sylvia Hinds-Radix (her office appears to have designated Jamison Davies who works for it to represent the defendants listed above)

  **Mailing address**:

  New York City Law Department
  100 Church Street
  New York, New York 10007

  Tel: (212) 356-1000
  E-mail: ServiceECF@law.nyc.gov

  Jamison Davies
  Tel: (212) 356-2490
  E-mail: davies@law.nyc.gov

UNITED STATES COURT OF APPEALS FOR
THE SECOND CIRCUIT

-------------------------------------------------- X

Towaki Komatsu,                                     Docket Number: 23-464

                                    Plaintiff,     **Affirmation in support of
emergency motion for
permission to file a
further supplemental
motion to recall the
mandate**

      v.

The City of New York,

                              Defendants.

-------------------------------------------------- X

## **Table of Contents**

**Section**                                                                 **Page**

1.   Preliminary Remarks.................................................................2

2.   Relief Sought..........................................................................3

3.   Reasons to Grant the Relief Sought.........................................4

4.   Why This is an Emergency Motion.........................................13

5.   Certificate of Compliance with Rule 27(d)(2)

# Preliminary Remarks

1.      I, Towaki Komatsu, declare, pursuant to 28 U.S.C. §1746, under penalty of

perjury that the information that is presented throughout this affirmation and

incorporated within it is true and accurate. The acronyms shown in the next table's

first column refer to ongoing and past litigation involving me to which I refer in

this affirmation that is listed to the right in that table.

| # | Acronym | Litigation |
|---|---------|------------|
| 1 | K1 | *Komatsu v. City of New York*, No. 20-10942 (VEC)(RWL)(S.D.N.Y. Jun. 17, 2022) |
| 2 | K2 | *Komatsu v. City of New York*, No. 23-464 (2d Cir. Aug. 2, 2023) |
| 3 | K3 | *Komatsu v. USA*, No. 21-cv-1838 (RJD)(RLM)(S.D.N.Y. Jan. 19, 2023) |
| 4 | K4 | *Komatsu v. USA*, No. 23-95 (2d Cir. Aug. 2, 2023) |

2.      The next table's first column lists acronyms that I use in this affirmation to

refer to things that are listed and otherwise described in its second column.

| Acronym | Refers To |
|---------|-----------|
| BRC | Bowery Residents' Committee, Inc. |
| CCRB | The New York City Civilian Complaint Review Board |
| CSO(s) | Federal court security officer(s) |
| DHS | The New York City Department of Homeless Services |
| DSS | The New York City Department of Social Services |
| HRA | The New York City Human Resources Administration |
| NYSCOA | The New York State Court of Appeals |
| OTDA | The New York State Office of Temporary and Disability Assistance |
| The Park View shelter | The homeless shelter located at 55 West 110th Street in Manhattan that BRC operates. |
| SCOTUS | The U.S. Supreme Court |
| USCOC | The U.S. Code of Conduct for United States Judges |

| USMS | The U.S. Marshals Service |
|------|---------------------------|
| The USMS' Crimes | How I defined this between pages 5 and 7 in the PDF file for my 6/2/22 filing in K3 (Dkt. 145) |

3.     DSS is the parent agency of HRA and DHS. DHS is tasked with dealing with homelessness in New York City and HRA is tasked with providing government benefits to people in New York City that partly include cash-assistance and food-stamp benefits. In the interests of simplicity, all references that I make in this affirmation to "HRA" may instead refer DHS.

4.     The abbreviations shown in the next table's first column refer to judges to whom I refer in this affirmation that are identified in that table's second column.

| Abbreviation | Judge |
|--------------|-------|
| Judge Caproni | U.S. District Judge Valerie Caproni |
| Judge Currault | U.S. Magistrate Judge Donna Phillips Currault |
| Judge Engoron | New York State Supreme Court Judge Arthur Engoron |
| Judge Lehrburger | U.S. Magistrate Judge Robert Lehrburger |

## Relief Sought

I urge this Court to immediately issue an order that grants me immediate relief by:

1.     Granting me retroactive authorization to file this motion to further supplement my 2/7/24 motion in K2 for authorization to file a motion in K2 to recall the mandate and reinstate my appeal that corresponds to K2.

2.     Granting me such other, further, and different relief as is just and equitable.

## **Reasons to Grant the Relief Sought**

1.      This Court's 2/21/24 decision in _Thomas v. United States_, No. 22-2026 (2d Cir. Feb. 21, 2024) is controlling law that contains the following findings that clearly and directly repudiate **a)** the filing restrictions that this Court imposed against me that have blocked me from being able to freely submit appellant briefs to this Court for appeals about final judgments that district courts have issued in litigation that I commenced and **b)** the fact that this Court has otherwise not let me submit appellant briefs in such appeals that I commenced about such final judgments:

   a.      "The right to appeal has long been recognized as sacrosanct, particularly in cases involving "the loss of a chance at an entire appellate proceeding." Campusano, 442 F.3d at 775."

   b.      "the district court abused its discretion and committed a legal error by summarily denying Thomas's petition without fact-finding."

2.      The first excerpt from _Thomas v. United States_ shown above confirms that mootness applies and demands that this Court recall the mandate and reinstate this appeal to uphold its findings that the right to appeal is sancrosanct partly because this Court illegally and prejudicially caused me to suffer the loss of a chance at an entire appellate proceeding partly in K2 by putting the equivalent of a roadblock in my path for that in the form of an illegal requirement for me to submit a motion for leave to appeal to this Court partly about final judgments.The second excerpt from _Thomas v. United States_ supports my position about the material fact that this

Court biasedly and prejudicially didn't engage in proper fact-finding partly about **a)** judicial misconduct that occurred in K1 and **b)** the degree to which I was adversely impacted by provocation by the USMS' Crimes against me that resulted in a reciprocal verbal backlash by me partly towards the district court on account of the fact that the district court allowed the USMS' Crimes to persist while the district court was required partly by _Sheppard v. Maxwell_, 384 U.S. 333, 86 S. Ct. 1507, 16 L. Ed. 2d 600 (1966) to promptly intervene on my behalf against the USMS and CSOs about the USMS Crimes by ending the USMS' Crimes.

3.      SCOTUS' decision in _Borough of Duryea, Pa. v. Guarnieri_, 564 U.S. 379, 131 S. Ct. 2488, 180 L. Ed. 2d 408 (2011) is controlling law and states the following partly about the First Amendment right to petition partly by pursuing appeals in litigation partly to this Court:

    a.      "the right to petition is generally concerned with expression directed to the government seeking redress of a grievance."

    b.      "Both speech and petition are integral to the democratic process"

    c.      "The right to petition allows citizens to express their ideas, hopes, and concerns to their government and their elected representatives, whereas the right to speak fosters the public exchange of ideas that is integral to deliberative democracy as well as to the whole realm of ideas and human affairs."

4.      This Court's decision in _Westmoreland v. Columbia Broadcasting System, Inc._, 752 F.2d 16 (2d Cir. 1984) points out the following:

    a.      Courts "exist primarily to adjudicate legal controversies" and "are

public forums".

      b.      The "courtroom and courthouse premises are subject to the control of the court."

      c.      Judges have "the power to preserve such tranquility" as the "central purpose" of courthouses requires."

      d.      The prospect of non-essential electronic devices inside of courthouses posed impermissible risks "to the administration of justice" partly by **a)** "causing distractions and diversion of judicial time" and **b)** possibly subjecting trial participants to psychological effects while also "jeopardizing "the required sense of solemnity, dignity and the search for truth.""

5.      This Court's 2/14/24 order in *Carota v. James, No.* 23-854 (2d Cir. Feb. 14, 2024) contains the following remarks on page 6 that confirm that the word "shall" is "mandatory language" that is synonymous with "must":

> "state laws use mandatory language (*e.g.*, "shall") in describing the duties of Defendants' official positions or commissions"

6.      The preceding information about *Carota v. James* is relevant largely because this confirms that when used to describe how judges must conduct themselves as judges, the words "shall" and "should" also are mandatory language instead of indicative of things about which judges have discretion. If this Court were to feel differently about this partly by contending that "should" isn't indicative of a mandatory duty, then it would also need to regard courthouse rules that prohibit

offensive expression by parties in litigation partly towards judges to be mere "guidance" and discretionary, especially in instances in which such litigants are provoked by courthouse personnel while judges condone that. As a reminder, selective-enforcement by judges partly about prohibitions against offensive behavior between participants in the judicial process partly by letting CSOs get away with doing so towards me is patently illegal and discriminatory. _Grayned v. City of Rockford_, 408 U.S. 104, 92 S. Ct. 2294, 33 L. Ed. 2d 222 (1972) confirms this point by pointing out that a "vague law impermissibly delegates basic policy matters" partly to judges "for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application."

7.    Canon 3(A)(4) in the USCOC includes the following relevant text:

> "A judge should accord to every person who has a legal interest in a proceeding, and that person's lawyer, the full right to be heard according to law."

8.    Canon 3(A)(4) in the USCOC states the following:

> "_Respect for Law._ A judge should respect and comply with the law and should act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary."

9.    Canon 3(A)(3) in the USCOC includes the following relevant text:

> "A judge should be patient, dignified, respectful, and courteous to litigants, jurors, witnesses, lawyers, and others with whom the judge deals in an official capacity. A judge should require similar conduct by those subject to the judge's control"

10.    Despite what I just discussed, Judge Currault implicitly confirmed her

refusal to comply with the preceding duties that are set forth in the USCOC in the 1/18/24 report and recommendation that she issued in _McManus v. Lnu_, Civil Action No. 23-7013 (E.D. La. Jan. 18, 2024) while she demonstrated naiveness and ignorance by citing the 1/19/23 decisioin in K3 in that report. While she fraudulently omitted the material fact in her 1/18/24 report that this Court prejudicially, biasedly, pretextually, and illegally subjected me to obstruction of justice by not letting me submit an appellant's brief in K4, she expressed the following in that report:

    a.    "The Director of USMS is required by statute and regulation to supervise USMS personnel and to investigate allegations of improper conduct."

    b.    The "USMS accepts complaints from aggrieved parties and operates a comprehensive administrative complaint system for members of the public."

    c.    Those "alternative remedies for aggrieved parties in [Plaintiff's] position" constitute special factors that foreclose a Bivens action".

    d.    The 2002 decision by the U.S. Court of Appeals for the Fifth Circuit in _Raz v. Oakes_, 48 F. App'x 481 (5th Cir. 2002) ruled that the Plaintiff in that appeal hadn't alleged acts that amounted to a constitutional violation while such acts involved court security personnel having allegedly "harassed, insulted, threatened, humiliated, and intimidated him and subjected him to excessive security checks". That preposterous outcome retrospectively confirms that every

single judge to whom I reported entirely valid complaints about the USMS' Crimes

againset me had a clear duty to promptly and decisively intervene on my behalf

about that.

11.     While issuing her 1/18/24 report to which I just referred, Judge Currault

fraudulently omitted the following material facts:

     a.     I clearly proved in K3 that personnel of the USMS had engaged in an

illegal and unduly prejudicial cover-up about the USMS' Crimes against me. This

explains why findings in the 6/27/17 decision in *Jennings v. Town of Stratford,* 263

F. Supp. 3d 391 (D. Conn. 2017) that were about the futility of a police officer to

report grievances in his chain of command due to bias and corruption in that chain

are equally applicable to the fact that it was always futile for me to report

grievances to the USMS abou the USMS' Crimes.

     b.     SCOTUS' decision in *Shepard  v. Maxwell*, 384 U.S. 333, 86 S. Ct.

1507, 16 L. Ed. 2d 600 (1966) is controlling law that this Court and other federal

judges have illegally, prejudicially, biasedly, subversively, and despicably

disavowed in regards to me largely by incorrigibly refusing to perform their legal

duty to hold the behavior and actions by the USMS and CSOs in proper check to

prevent illegal and otherwise abusive acts and omissions by them. This is in spite

of the fact that it is the judiciary's duty to hold the other branches of government

that in proper check.

c.  *Chambers v. Nasco, Inc.*, 501 U.S. 32, 111 S. Ct. 2123, 115 L. Ed. 2d 27 (1991) confirms that federal judges may punish the USMS and CSOs in response to illegal and otherwise abusive acts and omissions by them in instances in which statutes and rules aren't "up to the task" for doing so that includes situations when a Bivens remedy isn't available.

d.  18 U.S.C. §401(a) confirms that the USMS is required to obey, execute, and enforce all orders that U.S. district judges issue. Such orders certainly wouldn't include directions by such judges to have USMS personnel nor CSOs to harass, intimidate, make fun of, nor curse at a plaintiff inside of a federal courthouse. Judge Currault pointed out in her 1/18/24 report in *McManus v. Lnu* that the plaintiff in that case had alleged that he had experienced that behavior by USMS personnel inside of a federal courthouse.

12.  The decision that was issued in *Di Lapi v. City of New York*, No. 06-cv-3101 (E.D.N.Y. Jan. 9, 2012) states the following:

a.  "the mental process privilege is not absolute."

b.  ""[i]n order for judicial testimony to be required, the testimony must relate to the judge's factual knowledge"

c.  "An established exception to the mental process privilege exists for quasi-judicial officers in administrative proceedings where "a party has made a prima facie showing that the decision by an agency or a judicial officer is tainted by impropriety," McGoldrick, 110 F.R.D. at 155, or "upon a strong showing of bad faith or improper behavior""

d.  "Where a party has made such a prima facie showing, "the decision-making process may be an appropriate subject of inquiry.""

13.    The preceding findings in _Di Lapi v. City of New York_ confirm that I was entitled to have every federal judge who refused to intervene on my behalf about the USMS' Crimes against me partly by immediately ending the USMS' Crimes to provide others and I sworn testimony by them about their factual knowledge about that before this Court made decisions about whether to not let me submit appellant briefs in appeals that I commenced to this Court partly about final judgments in district court cases that I commenced. _Di Lapi v. City of New York_ also confirms that I was entitled to have Judge Caproni and Judge Lehrburger to provide others and I sworn testimony by her about their factual knowledge about why they neglected in the 6/17/22 decision in K1 that dismissed K1 and the report that Judge Lehrburger issued that recommended K1's dismissal to comment about the following, that among other things, confirm that I shouldn't have been directed in K1 to have issued a release for access to my medical records:

a.    NYPD body-camera video footage that was and illegally and prejudicially wasn't recorded on 12/26/17 partly by the body-camera that NYPD Officer Saquoi Harris then wore during interactions that he had with me.

b.    The CCRB's audio recording of its interview in February of 2018 of Mr. Harris about those interactions.

14.    Before she dismissed K1, I submitted legal filings in K1 that included links to copies of the video recording that I just discussed as well as a copy of the audio

recording of the CCRB's interview of Mr. Harris about me in February of 2018.

15.     The NYSCOA's decision in _Matter of Dunn_, 24 N.Y.3d 699, 27 N.E.3d 465,

3 N.Y.S.3d 751 (2015) contains the following relevant findings that were about

whether an attorney was properly accorded a full and fair hearing in accordance

with her due process rights to litigate an issue about alleged misconduct by her that

resulted in the imposition of sanctions against her following the issuance of

findings by a U.S. magistrate judge that recommended those sanctions:

    a.    "Under the circumstances presented here, we hold that respondent did
          not have a full and fair opportunity to litigate the issue of her alleged
          misconduct."

    b.    "the determination here was made on papers—without cross-
          examination or the opportunity to call witnesses."

    c.    "The cursory nature of the sanctions proceeding itself failed to
          provide a full and fair opportunity to litigate the issue."

    d.    "Accordingly, the order of the Appellate Division should be reversed,
          with costs, and the matter remitted to that Court for further
          proceedings in accordance with this opinion.

          Order reversed, with costs, and matter remitted to the Appellate
          Division, Third Department, for further proceedings in accordance
          with the opinion herein."

16.     _Donovan v. Penn Shipping Co., Inc._, 536 F.2d 536 (2d Cir. 1976) contains

the following findings in a dissenting opinion that support my position that this

Court clearly abused its discretion by not letting me submit an appellant's brief in

K2 and all other appeals to it that I commenced about final judgments in district

court cases that I commenced:

a. "The interest of the courts in efficient administration, though important, is not superior to the interests of the plaintiff"

b. "In civil matters like this one, courts exist to resolve disputes between litigants. When a plaintiff claims that he has been injured because of the fault of a defendant, the court proceeding is designed to give the plaintiff a fair opportunity to prove his contention and to obtain adequate compensation, if he is correct."

c. "The majority's basic premise appears to be that the primary interest of the courts is the efficiency of judicial administration. This is not so."

## **Why This is an Emergency Motion**

1. Judge Engoron's 1/25/21 decision in _Fisher v. City of New York_, 2021 N.Y. Slip Op 30210 (Sup. Ct. 2021) confirms that HRA has a duty to "provide safe shelter to homeless people" and the decision in _Olivierre v. Parkchester Preserv. Co., LP_, 2022 N.Y. Slip Op 34471 (Sup. Ct. 2022) contains the following findings that confirm that being homeless and otherwise being at imminent risk of becoming homeless is irreparable harm that warrants the immediate issuance of injunctive relief to prevent and otherwise end that:

a. "the threat of homelessness constitutes irreparable injury"

b. "As for the issue of whether there will be irreparable harm without the ordering of an injunction, this is exactly the type of case that injunctive relief is meant for, as "a remedy at law would be inadequate" and the brutality of homelessness is too great a risk"

2. _Mitchell v. Annucci_, No. 9: 19-cv-0718 (MAD/ML) (N.D.N.Y. July 19, 2019) states the following about prevailing legal standards that apply to instances in which courts need to grant preliminary injunctions to plaintiffs to prevent and

otherwise end irreparable harm:

    a.    "courts may grant a preliminary injunction where a plaintiff demonstrates `irreparable harm' and meets one of two related standards: `either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party.'"

    b.    "when the moving party seeks a "mandatory preliminary injunction that alters the status quo by commanding a positive act," the burden is "even higher."

    c.    "a mandatory preliminary injunction "should issue only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief.""

    d.    "A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction."

    e.    "A party who seeks the extraordinary remedy of a preliminary injunction must show the alleged irreparable harm to be imminent, not remote or speculative, and the alleged injury to constitute one that is incapable of being fully remedied by monetary damages."

    f.    "a plaintiff seeking to satisfy the irreparable harm requirement must demonstrate that "absent a preliminary injunction [he or she] will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm.""

3.    The information shown in the annexed **Exhibit A** consists of the following:

    a.    An incident information slip that I was provided by the NYPD's 28th Precinct that is associated with the police report number 2024-28-717 that is about my having been criminally assaulted on 2/15/24 at roughly 12 pm inside of the cafeteria in the Park View shelter by someone who stood behind me while I was

waiting in a line to be served lunch.

b.     Business cards that I was provided on 2/15/24 by NYPD Officers

Colon (shield #: 24431) and Quinones (shield #: 12272) in the lobby of the Park

View shelter while they responded to a 911 call that I made about having been

assaulted in that shelter's cafeteria.

4.     The information shown in the annexed **Exhibit B** consists of the following:

a.     A medical report that I was issued on 2/15/24 by Mount Sinai's

Morningside Hospital that diagnosed me with a head injury from the assault that I

experienced on 2/15/24 inside of the cafeteria in the Park View shelter.

5.     Most of those who reside in the Park View shelter have a mental illness or a

drug abuse problem. In contrast to them, I don't have those problems and this is

reflected by information in the 2/15/24 medical report. A problem that I do have is

with federal judges illegally and prejudicially violating my First Amendment rights

to litigate matters and prevail on the merits in such litigation prior to then being

able to use damage awards from such litigation to pay for the costs of renting an

apartment instead of having to need to reside in homeless shelters. The material

fact that I prevailed in K1 that was a malicious prosecution cements the fact that I

was entitled to immediate partial summary judgment in K1 to promptly be awarded

damages that I could then have used for a variety of purposes that partly include

paying to rent an apartment.

6.     Also, when I returned to the Park View shelter on 2/25/24 at roughly 2:05 pm, security personnel who work there unconscionably didn't examine a medium-sized duffel bag that I had with me in the lobby of that shelter where there is both an x-ray machine and video security cameras. That was the third or fourth time that happened while I returned to that shelter. Moreover, while I was preparing this affirmation at 4:10 pm on 2/25/24 in room 234 in that shelter, a different resident was illegally smoking marijuana in the back of that room as he was then interfering with my ability to concentrate on this affirmation by doing so. That was due to the noxious odor from that smoke. There is a video security camera in the hallway outside of that room and in front of Room 233 that likely recorded him leaving that room then after I expressed my objection to him then about his smoking.

7.     Furthermore, since 2023, DHS has repeatedly and unconconsionably caused me to be assigned to such shelters that are primarily for people who have mental illness problems, drug abuse problems, and/or criminal convictions. I have also never been convicted of any crime. The decisions that DHS has made to cause me to be transferred to such shelters has been pretextual and First Amendment retaliation in response to and retribution for pursuing litigation against HRA and DHS that has been partly assigned to OTDA for fair hearings.

8.     It goes without saying that if I continue to be criminally assaulted partly inside of shelters, then there is a good chance that I may not survive or may

otherwise be substantially disabled. If that occurs, then any relief that this Court

may later grant me will be utterly pointless as blood will be on this Court's hands

instead. This sufficiently explains why this Court needs to finally do its job and

immediately grant me proper relief partly to enable me to immediately stop having

to reside in homeless shelters. This point is also buttressed by the material fact that

HRA illegally reduced cash-assistance benefits that I receive from it on a

bimonthly basis by roughly 75% without prior notice on 2/8/24 in defiance of

findings in *Mtr of Gross v. Perales*, 130 Misc. 2d 132, 495 N.Y.S.2d 125 (Sup. Ct.

1985) that point out that HRA is prohibited from reducing government benefits

that it issues to me partly for cash-assistance benefits without first balancing the

timeliness in which it does so against both **a)** my due process rights and **b)** the

notice requirements for reducing such benefits. HRA illegally didn't provide me

any prior notice about its decision to reduce my cash-assistance benefits. Although

I directed OTDA weeks ago to conduct a fair hearing on my behalf against HRA

about that reduction, OTDA prejudicially and biasedly hasn't done so nor informed

me of when it may do so.

Dated:      February 25, 2024

                                   _____
                                           Towaki Komatsu

*Plaintiff, Pro Se*

55 West 110th St.
New York, NY 10026
Tel: 305-784-7450
E-mail: Towaki_Komatsu@yahoo.com

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 27(d)(2)</u>

I, Towaki Komatsu, certify that this motion contains 4,081 words and is 17

pages in length (excluding, as permitted by Fed. R. App. P. 32(f), the table of

authorities, appended exhibits, and certificate of compliance), as counted by the

Microsoft Word computer software used to prepare this motion.

I further certify pursuant to Fed. R. App. P. 27(d)(2) that the attached motion

is proportionally spaced and has a typeface (Times New Roman) of 14 points.


Dated:        February 25, 2024


Towaki Komatsu

*Plaintiff, Pro Se*

55 West 110th St.
New York, NY 10026
Tel: 305-784-7450
E-mail: Towaki_Komatsu@yahoo.com

Exhibit A

**INCIDENT INFORMATION SLIP**
PD 301-164 (Rev. 07-15)

Date: 2/15/24

Welcome to 028 2271-89 Frederick Douglass Blvd, New York, NY 10027 (212)-678-1611
(Command) (Address) (Telephone No.)

We hope that your business with us was handled satisfactorily. Your particular matter has been assigned the following number(s)

Complaint Report No. 2024-28-717 Accident Report No. _____ Aided Report No. _____

Reported to: PO Colon
(Rank, Name, Shield/Tax No.)

Date of Occurrence: 2/15/24 Time: _____

Location of Occurrence: 55 W 110 St

Crime/Incident: Assault 3

Please keep this report should you have to refer to this matter in the future. If you need any further assistance feel free to

contact us at telephone number (212)-678-1611 . Please let us know if you have any suggestions on how we can

better serve you. As you may already know, we will provide you with a crime prevention survey of your residence or business.

Please ask for more information on this and other crime prevention initiatives. Our goal is to make you and your property safe.

COURTESY - PROFESSIONALISM - RESPECT

REMEMBER: CALL "911" FOR EMERGENCIES ONLY!!!!



**NYPD**
New York City Police Department

POLICE OFFICER COLON
Shield Number 24431

28 212-678-1611
Command



**NYPD**
New York City Police Department

POLICE OFFICER QUINONES
Shield Number 12272

028 212-678-1611
Command

# Exhibit B



# AFTER VISIT SUMMARY

**Towaki Komatsu**  MRS:  ███  📅 2/15/2024  📍 Mount Sinai Morningside Emergency Department 212-636-3375

## Instructions

If you wish, you may file a police report for the assault that occurred today.  In discussion with social work, if you request to be transferred shelters you must go through the social worker assigned at your current assigned shelter.  Return if you develop any visual changes, difficulty speaking or moving, or any other new or concerning symptoms.

 **Read the attached information**
1. CRIME VICTIM (ENGLISH)
2. PHYSICAL ASSAULT (ENGLISH)
3. CONCUSSION, NEW (ADULT) (ENGLISH)

## What's Next

You currently have no upcoming appointments scheduled.

**Thank you for choosing the Emergency Department at Mount Sinai Morningside. We hope your needs were met during your visit.**

**Please consider enrolling for Mount Sinai MyChart for more information about your visit.**

The examination and treatment you received today in the Emergency Department was rendered on an emergency basis, and is no substitute for comprehensive medical care from a primary care doctor who can follow you over time, monitor progress, and address ongoing and new symptoms, illness and injury.

Follow up recommendations and diagnosis specific instructions appear below. If you cannot see the above doctor and/or your condition worsens so that you require emergency treatment, please return to this ED.

If for any reason the doctor you have been referred to **cannot** see you for a follow-up appointment, you can obtain additional referrals at 1-877-463-6362.

If you have questions relating to the treatment you received today in the emergency department, please call: Adult ED: 212-523-3088 or for Pediatric ED: 212-523-3636

## Today's Visit

You were seen by Christopher Reverte, MD and Brian Brown, MD

**Reason for Visit**
Assault Victim

**Diagnosis**
Assault

🖉 **Medications Given**
acetaminophen (TYLENOL) Last given at 2:25 PM
ibuprofen (Advil,MOTRIN) Last given at 2:25 PM

## MyMountSinai

View your After Visit Summary and more online at **https://mychart.mountsinai.org/mychart/**.

Name: Towaki Komatsu | DOB: 2/23/1973 | MRN: 7803824 | PCP: Cathi Nicklas, NP | Legal Name: Towaki Komatsu

# ED Provider Notes

## Christopher Reverte, MD at 02/15/24 1430

**Past Medical History**
No past medical history on file.

**Past Surgical History:**

| Pr | Laterality | Date |
|----|------------|------|
| • ███████████████ | | |

**Social History**

Tobacco Use
- Smoking status:      Never
- Smokeless tobacco:   Never
- Tobacco comments:
  *ECW:*

Substance Use Topics
- Alcohol use:         No
  *Comment: Alcoholic Drinks/day:*
- Drug use:            No

**Sexual Orientation/Gender Identity**
- How do you describe your       Heterosexual or Straight
  sexual orientation?
- How do you describe your       Male
  current gender identity?
- What was the sex written on    Male
  your original birth
  certificate?
- Female                         Yes
- Male                           No
- Female-to-Male                 No
  spectrum(FTM)/Transgender
  Male/Trans Man
- Male-to-Female                 No
  spectrum(MTF)/Transgender
  Female/Trans Woman
- Something else                 No

**Allergies**

| Allergen | Reactions |
|----------|-----------|
| • ██████████████ | Other |

# History of Present Illness

50-year-old shelter domicile male presents with head injury.  Patient was assaulted by unknown resident at his shelter at noon while he was waiting for lunch, sustaining 6 blows with closed fist to left temple.  No LOC, not on blood thinners.  Complains of mild pain and swelling to left head.  No visual changes or neck pain.  No vomiting or seizures.  Patient has open ligation against shelter system for episodes of violence from other shelter residents.

Case 23-464, Document 50-1, 02/26/2024, 3615596, Page27 of 30

Patient is a 50 y.o. male. The history is provided by the patient. Past medical charts, past medical history, allergies, home medications and social history reviewed.

## Review of Systems

Review of Systems
Constitutional: Negative for fever.
HENT: Negative for dental problem.
Eyes: Negative for visual disturbance.
Gastrointestinal: Negative for abdominal pain.
Neurological: Positive for headaches. Negative for dizziness, seizures, syncope, weakness and numbness.

## Physical Exam

BP 133/84 (BP Location: Left Arm)  | Pulse 92 | Temp 36.9 °C (98.4 °F) (Oral)  | Resp 16 | Ht 1.778 m (5' 10")  | Wt 72.6 kg (160 lb)  | SpO2 100%  | BMI 22.96 kg/m²

Physical Exam Vitals and nursing note reviewed.
Constitutional:
  General: He is not in acute distress.
  Appearance: Normal appearance.
HENT:
  Head: Normocephalic and atraumatic.
  Comments: **No palpable skull fracture, no periorbital ecchymoses, no battle sign, no hemotympanum. Nasal septum midline without hematoma. No midface tenderness, jaw malocclusion or mobile teeth.**

**Small, minimally tender swelling to left eyebrow.**
  Mouth/Throat:
  Mouth: Mucous membranes are moist.
Eyes:
  General: No scleral icterus.
  Extraocular Movements: Extraocular movements intact.
  Conjunctiva/sclera: Conjunctivae normal.
  Pupils: Pupils are equal, round, and reactive to light.
  Comments: **EOMs full, no pupillary asymmetry.  Reactive to light.**
Cardiovascular:
  Rate and Rhythm: Normal rate and regular rhythm.
  Pulses: Normal pulses.
Pulmonary:
  Effort: Pulmonary effort is normal. No respiratory distress.
Abdominal:
  General: Abdomen is flat. There is no distension.
Musculoskeletal:
  General: Normal range of motion.
  Cervical back: Normal range of motion.
  Comments: **No deformity or bony tenderness.  Compartments soft and compressible, full range of motion of all articulations.  Pulses 2+.**
Skin:
  General: Skin is warm and dry.
  Capillary Refill: Capillary refill takes less than 2 seconds.
  Findings: No bruising.
  Comments: **No lacerations, abrasions or ecchymoses**
Neurological:
  General: No focal deficit present.
  Mental Status: He is alert and oriented to person, place, and time.
Psychiatric:
  Mood and Affect: Mood normal.
  Behavior: Behavior normal.

## Assessment/Plan/MDM

MS ED MDM 2023:
Problems Addressed:
 **Primary** **Problem:** **Head injury**
  **Threat to life or bodily functions, including possible need for hospitalization**
 **Assessment and Plan:** Low risk mechanism, do not suspect clinically important traumatic brain injury.
-pain control
-social work evaluation for safe discharge
-anticipate discharge
Data Reviewed:
 **Ordered tests and reviewed test results**
 Reviewed external notes **Clinic and inpatient record**
 Discussion of tests/management with an external provider, including consultant: Pt seen by SW Rise, further updates per course notes
Risk of Patient Management:
 Drugs: **Counseled on OTC drugs**


## Updates

Updates
**ED Course** as of 02/15/24 1443
**Thu Feb 15, 2024**
1436      Rise Gibson SW at bedside [CR]
1443      will advise pt to file police report at nearest
          precinct to assault; cleared for dc [CR]

**ED Course User Index**
[CR] Christopher Reverte, MD



## PGY3

PGY-3


## ED Attending Assessment/Plan

**Attending Note**


50-year-old shelter domicile male presents with head injury. Patient was assaulted by unknown resident at his shelter at noon while he was waiting for lunch, sustaining 6 blows with closed fist to left temple. No LOC, not on blood thinners. Complains of mild pain and swelling to left head. No visual changes or neck pain. No vomiting or seizures. Patient has open ligation against shelter system for episodes of violence from other shelter residents. On exam the patient very well-appearing comfortable. Normal vital signs. No significant hematoma scalp exam. No CSF leak. Negative battle raccoon's. No signs of intracranial hemorrhage, skull fracture. No indication for CT at this time. C-spine cleared clinically. Will treat symptomatically. Patient happy with the plan. Patient requesting social work assistance for shelter options. Patient to return if new or worsening symptoms.
Christopher Reverte, MD
02/15/2024 2:39 PM

2/20/24, 6:01 PM                                    MyMountSinai - Visit Summary

# ED Notes

### Rise G at 02/15/24 1521

Writer met with the pt at bedside. Pt reports that he was hit in the head several times while standing on a food line in the cafeteria,  from a "guy" that lives in the same same as him. Writer asked if he called the police to make a police report. Pt states that the police were there with thir body cameras. He states that there are cameras in the cafeteria. Writer asked the pt if he filed a physical police report. Pt states," they can look at the videos on the cameras". Writer communicated that he needs to file a polce report. Writer asked if he felt d=safe going back to the shelter. Pt states he does not feel safe. Writer communicated to the pt that I cannot place him in a new shelter. He will need to convey to his case manager at the shelter that he does not feel =safe and they will have to move you to another shelter. Pt states that "they will not do that" Writer aske why not, they hare responcible for the safety of the shelter residents. He states "they all work for DHS and they do not care". He reports that he "has no mental illness, does not use drugs and does not drink alcohol and "they keep placing me in shelters that have this popultion".

Writer offered the pt resources including  Civil Rights Attorneys and the pt turned them down. Writer advised the pt to go to the Precinct where this assault happened and file a report to at least have proof that the assault took place. Writer communicated to the pt if he needs an order of protection, he will need to have police reports.

Rise Gibson LMSW, Master CASAC
Mount Sinai Morningside ED Social Work
646-864-6638

# Discharge Instructions

### Brian Brown, MD at 02/15/24 1454

If you wish, you may file a police report for the assault that occurred today.  In discussion with social work, if you request to be transferred shelters you must go through the social worker assigned at your current assigned shelter.  Return if you develop any visual changes, difficulty speaking or moving, or any other new or concerning symptoms.

# ED Triage/Intake

### Shelly A Culzac at 02/15/24 1332

Pt. arrived via ems-states that he was assaulted and punched to his head multiple times at his shelter today. Pt. denies loc.-not on any blood thinners.

# Attestation

### Christopher Reverte, MD at 02/15/24 1439

Reviewed Chart Elements:
  past medical charts, home medications, social history, past medical history and allergies
  I have personally seen and examined this patient. I have fully participated in the care of this patient. I have reviewed all pertinent clinical information. I agree with the management and disposition of the patient.
  Nursing records reviewed

Case 23-464, Document 50-1, 02/26/2024, 3615596, Page30 of 30

Resident:
  I was physically present, saw, evaluated, and participated in the management of the patient, confirming the patient history, ROS, PMH/FH/SH and PE as documented by the resident.

**ED Course** as of 02/15/24 1443
**Thu Feb 15, 2024**
1436    Rise Gibson SW at bedside [CR]
1443    will advise pt to file police report at nearest
            precinct to assault; cleared for dc [CR]

**ED Course User Index**
[CR] Christopher Reverte, MD

# Discharge Attachments

CRIME VICTIM (ENGLISH)
PHYSICAL ASSAULT (ENGLISH)
CONCUSSION, NEW (ADULT) (ENGLISH)

MyChart® licensed from Epic Systems Corporation © 1999 - 2024